Today is People v. Sallee. For the appellant, Ms. Wyman, and for the athlete, Mr. McNeil. You may proceed. May I please have the court? I represent the defendant, or the plaintiff, the plaintiff, and, sorry. My name is Ruth Wyman. I represent Tina Sallee, who is the defendant appellant in this case. The defendant, Ms. Sallee, was convicted in a bench trial in Macon County on the felony charge of disorderly conduct. The facts of the case are that she filed a police report, attempted to, and finally was able to file a police report with the Blue Mound Police when her then-boyfriend, Paul Keene, attacked her. They had been living together. She was the custodian of her two children, who were also residing there at the time of the attack, about one o'clock in the morning on a Saturday night, Sunday morning. Paul Keene's mother was also staying with the parties at Paul Keene's house in Blue Mound. What's interesting, and I think important in this case, and why this case and the court's ruling should be overturned, is that the state failed to meet its burden of proof, finding the defendant guilty. What's important, I think, is that the trial judge, after hearing the evidence and agreeing to take judicial notice of the trial court proceedings in a related case, that is, the order of protection case where Dina filed for an order of protection against Paul Keene and Paul Keene filed for an order of protection against Dina Sallee, the court in that case, and under a different trial judge, granted Dina Sallee an order of protection. The judge had also granted an order of protection to Paul Keene. That occurred in October of 2010. Then the court agreed to take judicial notice of those findings, and the transcript is part of that record. The court then heard evidence in these trial court proceedings in the criminal case, including hearing testimony of Dina Sallee, of Paul Keene, of Dina's daughter, of Paul Keene's mother, and then of Aaron Kitchens and James Knierman. Those witnesses, in addition to, I believe, one other witness, also testified in the order of protection proceedings. In these order of protection proceedings, Aaron Kitchens and James Knierman testified what great friends they were with Paul Keene. They were best friends, lifelong friends, close neighbors, interacted with Paul Keene on a daily or certainly weekly basis, and went over to his house and he spent time over at their house. However, despite the trial court advising that it would take judicial notice of the order of protection proceedings and the transcript that was part of that record, in which Aaron Kitchens and James Knierman both advised they were... Who said anything about the transcript of what they said? Well, that was admitted as part of the... That's only going to mean someone filed a claim and someone else had a hearing and the court had an order. I mean, the testimony wouldn't normally be part of it, would it? I believe so, in that the transcript was given as part of, and I believe it was part of the State's Exhibit 7, that was admitted as part of the court record in the trial court proceedings. Were the Kitchens and Knierman, assuming that that was even the case, testify any differently at the trial in this case than they did at the OP hearing? The testimony was... The difference was with regard to their relationship with Paul Keene. And what the court then said, the trial court in the criminal case, said that the trial court believed that James Knierman and Aaron Kitchens, Aaron Kitchens being a police officer, were the most neutral witnesses. He was going to take their word above the word of any of the other witnesses who were family members. Because they were critical, they weren't family, they weren't close friends, they were the most neutral witnesses and appeared to not even want to be in court, not even want to be testifying. And that, I believe, the court failed to then take that notice and the evidence that the court had agreed to previously take judicial notice of, and that Petitioner's Exhibit 7. Now there's a couple other issues that I think are important... Well, because it is opposite of what their admissions and their testimony was. Well, that was my question. Did they testify substantially differently at the trial in this case before Judge Steadman than they testified to at the OP hearing? My understanding of the record is all that stuff was brought out at both. You're correct in that the testimony about what they observed and what they saw... No, their connection and background and all the rest of it. No, I don't... I believe that was significant... But you were trial counsel, weren't you? Yes, it was... Couldn't you have asked them those questions at the hearing in front of Judge Steadman to bring out the alleged relationship? Aren't you big buddies with Paul King? Couldn't you have done that? I could have done... I suppose I could have done that, but the court had already advised that it was taking that judicial notice of those proceedings and of the transcript and had that transcript in front of it as well. So here they were testifying and all of this allegedly prejudicial stuff that shows bias, you chose not to elicit? Well, we elicited that... we elicited on cross-examination, I believe we elicited their connections, their fact that they're neighbors, that they'd gone over to the house, and they certainly played that down. And then the court... But counsel, it seems to me that the court was aware of that, but the court still assessed credibility and found them to be credible, so... I think that's a fair assessment that that's what the court... the court decided that these two people, Aaron Kitchens, a police officer, and James Nierman, were neutral witnesses, decided, despite the fact that the testimony had been in the order of protection proceedings, that they were lifelong friends, good buddies, spent lots of time together, that these people somehow, under his opinion, were neutral witnesses. Believable, I think, is the term. He deemed them credible, didn't he? He did deem them credible. He also referred to them in his ruling as neutral, the most neutral type of witnesses. The court also erred in failing not only to consider that interest and bias of those witnesses, but in denying the defendant's right to introduce evidence of the bias and interest of Paul Keene, the jilted ex-boyfriend, with regard to the small claims suit that was pending at the time. The trial court did allow some minimal testimony with regard to the fact that, yes, Paul Keene was the defendant in a small claims case filed by Dina Salih, but refused to allow further evidence with regard to the contract, the terms of the contract, and the fact that, in this offer of proof, that Paul Keene could be liable up to several thousand dollars if Dina Salih was successful in that lawsuit. And part of that lawsuit, the small claims suit under the contract, was if she moved out in less than a certain number of years. Now, moving out or being kicked out or terminated was part of that contract, and the court, despite that relevance and the importance of that interest and bias that was present in that case, refused to allow that and deny that offer of proof. Under the case law, that was clearly relevant, and that was part of the theory of the defendant's case, and not allowing that cross-examination on the matters which would reasonably tend to show that bias, interest, and motive to testify falsely, all of which applied to Paul Keene and his allegations, were relevant and should have been allowed. People v. Phillips, 1981, 95, 11, 3, 10, 13, and 10, 20. That evidence of bias, interest, motive, it wasn't remote, not uncertain. That evidence was clearly relevant and would have, and if allowed to be, considered. So the court heard about the lawsuit. The court heard that there was a lawsuit where the defendant was suing Paul Keene, right? The court heard that amount of evidence. The court heard that there was $10,000 at issue? Up to $10,000, yes, because it's a small lawsuit. So the details of the lawsuit and the basis of the claim, that's the only thing the court kept out. You made an offer of proof. The court heard it and said, no, it's still not necessary. I'm not going to let it in. Right. And I believe that under the case law, under people, so no reasonable person hearing all of this could have concluded that it was appropriate to deny the offer of proof. That's the abuse of discretion standard. That's correct. And then with regard to the proving the defendant guilty beyond a reasonable doubt, you have the evidence and the court had the evidence before it of the cuts on both of the defendant's forearms that she had her staying all night in the closed bedroom, not allowing anyone in and keeping, I believe the testimony was keeping her back against the door to keep anyone from coming in. And then leaving as soon as she could in the morning, going to, taking her children out, getting her children into a safe place, returning her children actually to the father of the children from whom she was divorced, and then seeking assistance from a woman she had met, I believe an acquaintance of hers, in order to try to get her personal belongings out of the house. The testimony and the evidence was that the court, I think, did not give proper weight to the interest and bias of these witnesses, and especially the bias and interest of not only Aaron Kitchens and James Nearman, but of Paul Keene, the Jilted Ex-Boyfriend, who should have, with regard to not only the bias and interest in that contract under the small claims case, but simply in his bias and interest in no longer being in a relationship with Dina Salih. And we would ask that the court reverse the trial court's ruling and find her not guilty or remand for further evidence with regard to the contract in the small claims case. Thank you. Mr. McNeil. May it please the court. Counsel. As for the argument one, the sufficiency of the evidence argument, there was testimony from multiple witnesses that observed defendant cutting herself. This was Mr. Keene and Mr. Keene's mother. However, their testimony was consistent. There were also multiple witnesses that testified they observed defendant admit to cutting herself outside of Mr. Keene's house during an argument. Counsel, did she actually admit that she cut herself? It seems like to me it was a little bit less clear than that. And the witnesses testified that she said, the mother did not see me do that. That being the quotes here. I think the exact quotes were, your mom wasn't in the room when I did that. So the inference, for the sake of your argument, is that means cut herself. The way I read the cold record, the accusation proceeded directly before that of Keene saying, you cut yourself and you're blaming me for this. My mom saw it. So the reasonable inference there would be that she was referring to cutting herself. And that would be really the only logical reason to bring up the mom being or not being in the room at that point after that accusation. These are the two witnesses that are at issue in argument two, which I'll get to. But as for the sufficiency of the evidence argument, of course, the well settled standard is that you look at the evidence in the light most favorable to the prosecution. Not only were there the multiple witnesses testifying to her omissions and actually cutting herself, there was also, the trial court noted, the lack of common sense or logic in the defendant's actions after the alleged attack. One, she stayed in the house the whole night after the alleged attack. This would be the person who attacked her, that house, and also even if she alleged that she stayed up against the door to not let anyone in, her daughter was still in the house too, her young daughter. She did not remove her daughter from the house until the next day as well. As the trial court noted, this defied common sense. There was also evidence from the officer who took her report that the knife wounds looked superficial. There was no indication that there was any medical dressing or medical treatment to the knife wounds. Those knife wounds are also in multiple pictures in the record that your honors can look at. That officer also noted that she waited four days before filing the report or even contacting the Blue Mound Police Department. She testified to the contrary. Of course, the Charter of Fact was in the best position to believe whoever's story there. So there was sufficient evidence, especially looking at the evidence in the light most favorable to the prosecution here. As for Argument 2, the trial court's evaluation of the credibility of Aaron Kitchens and Officer Knierim was not against the manifest way of the evidence. It's a manifest way of the evidence standard because they're in the superior position to evaluate the credibility and the demeanor of the witnesses as they're testifying. That's important here because the trial court in making its findings, wasn't that these witnesses were completely neutral or completely unbiased. Its ultimate finding was that these witnesses were the most credible. Playing into that, it's true. Officer Knierim testified first and foremost, Officer Knierim testified that specifically he was not close friends with Keane. They were next door neighbors. He knew him for life or as lifelong acquaintances, which the trial court acknowledged both of these witnesses were acquaintances with Keane, but he testified specifically that he was not close friends with Keane. So these two, Kitchens did, on the other hand, testify at trial that he was, he had known the defendant and they'd been friends for most of their lives. However, this was only one part of the trial court's findings. The ultimate conclusion, these two testimonies were credible, had to do with their consistency and obviously their demeanor and the trial court was in the best position to see that. At most, this was a harmless error because as I said, there's no debate that Knierim was not a close friend to Keane and his testimony was exactly the same as Kitchens. So this was going into the evidence even without Mr. Kitchens' testimony. In fact, the trial court noted that Officer Knierim testified sort of reluctantly in this case and didn't seem like he wanted to testify against defendant at all. So at most, and along with all the other evidence indicating defendant's guilt here, Kitchens' testimony was at most a harmless error because the verdict would have been the same beyond a reasonable doubt. Argument three concerns the pending lawsuit between defendant and Keane. Here, this was relevant to the case and the trial court handled it properly at any rate. First, as Your Honors noted, the trial court allowed cross-examination on the subject of this contract. It knew that defendant was suing Keane. It knew that it could be upwards of $10,000. So the trial court knew defendant was suing Keane, if that mattered, which it didn't. Here, there was no question of the bias or hostility between the two witnesses. The state would argue that the bias would be much more, or the hostility would be much greater in this case where defendant accused Keane of committing a felony, of committing, of cutting her multiple times. He didn't need any extra bias or hostility in the form of a small claims contract dispute. The trial court was aware and presumably applied any extra bias or hostility that this contract created. Again, as I submit, there didn't really need to be any more evidence of their adversarial nature between the two. At any rate, defendant wasn't prejudiced by this limiting of the scope of the cross-examination regarding this contract. So because there was sufficient evidence to convict and the trial court did not commit any reversible error, this court should affirm defendant's conviction. Any questions? I don't approve the hearing. Thank you. Just briefly. The trial court took issue with how the defendant, Dina Salee, the fact that she didn't leave at 1 or 2 in the morning and instead stayed in her bedroom and said that that was somehow incredible. The defendant had testified to having her back against the door, staying up all night and therefore not allowing anyone else into the bedroom until the morning and then she could leave with daylight and with being able to see what was going on. The suggestion that that's somehow not credible, when she had been the one who had been attacked, I think was not appropriate. The state brought up in its brief, and now again, the fact that there were superficial wounds on defendant's forearms. The photos that are as part of the appendix show, that's People's Exhibit 4, show the wounds. They are superficial because they are on top, they're not internal. But I think there's perhaps some misunderstanding of the definition of superficial. Were the photos offered and received with evidence at the trial? Yes, they were, sir. Those are all, and those are as part of the appendix of the defendant's appellant, Dina Salee. You'll see those as People's Exhibits. In fact, defendant and the state both had the same exhibit, so I think we ended up just using 4, 5, and 6 under the People's Exhibit numbers, which show her forearms, both sides of which were cut up. They were superficial wounds because those are on top of the skin and those were cutting into the skin and you can see, because this is several days later, the scabs starting to form. You can also see, and the photo perhaps doesn't look as clear on the forearms as she opens her arms up in the following People's Exhibit, I believe that's 5, and then the photo of People's Exhibit 6, all of which again were entered into and admitted into evidence, was of her toe where the sharp object, whether that was a sharp piece of plastic or a knife, fell after I think it got caught in one of her arms, fell and then nipped her toe or her toenail as the testimony had discussed. And the evidence had been admitted onto that. The suggestion as well by the state that it's not credible that she waited four days to report this. The evidence was that she attempted to report this to the Blue Mount Police, which in Blue Mount there is one police officer, and that happens to be a good friend of Paul Keene, as the testimony and the evidence showed. He refused to take that evidence, or refused to take that police report, and as Dina Salee testified, she attempted on multiple occasions. And finally, after going to the Macon County Sheriff's Department, where they then called over and told Blue Mount Police Officer Tom Bingaman he had to take the report, did he then take that? But that took several days of Dina Salee trying to be able to file that report. I see my time is virtually up. Are there any questions? I don't appear to be any. Thank you. We'll take this matter under advisement and stand in recess until further call.